## A97A0172. FREYER et al. v. SILVER.
(488 SE2d 728)

ANDREWS, Chief Judge.

We granted the application for interlocutory appeal of the defendants below in this slip and fall case to consider the trial court's denial of their motions for summary judgment. We reverse.

1. In reviewing grant or denial of summary judgment, this Court conducts a de novo review of the evidence. *Goring v. Martinez*, 224 Ga. App. 137, 138 (2) (479 SE2d 432) (1996); *Gaskins v. Hand*, 219 Ga. App. 823 (466 SE2d 688) (1996).

"To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. If there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial. [Cit.] A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the bur-

den on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue." (Emphasis in original.) *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

2. So viewing the evidence here, it was that, on May 23, 1992, Silver went to a Po Folks operated by defendant Folks, Inc. and located in a shopping center owned by Domus Properties. Defendants Freyer and Uberto are the general partners of Domus and purchased the shopping center in 1991, after its construction. Prior to the purchase, Freyer retained architect Coursey and the two walked over the property so Coursey could evaluate it from a structural standpoint, and no problems were noted.

Silver had been to this Po Folks before, but had eaten inside. On May 23, 1992, "a pleasant day," near suppertime and while it was still daylight, Silver went to Po Folks to order takeout. She parked her car in one of two spots designated for "To Go Parking." The spot in which she parked was directly adjacent to a catch basin for draining water from the parking lot. She pulled straight into the parking place, placing the catch basin on the passenger side of her car. She was familiar with catch basins and acknowledged that one was located near her residence. She went in, ordered her food, and returned to the car to wait for it, since she had her dog in the car. She did not cross the catch basin either going into the restaurant or coming out. After returning safely to the car, she walked down the passenger side, next to the catch basin. She was looking where she was going and stood by the side of the car looking toward Po Folks and standing so that her toes were pointing toward the catch basin.

Asked what caused her to fall, Silver testified as follows: "I must have just shifted my weight or moved my foot a little, and all of a sudden I went sliding down with both feet into this area. . . . There was some shadow cast from the sun in the west. . . . I know that there was a shadow here. . . . It was like early dusk. Q. Did you have any difficulty seeing where you were going? A. No. . . . Q. Do you believe the light conditions had anything to do with your fall? A. I, I really don't know. Q. Do you know why you fell? A. Because there was a hole there. There was an area that was slanting down that I did not see, and I couldn't see. . . . It looked straight. . . . There was no way I could see it. It looked as if it was a very safe place and a flat place to stand. Q. Before the fall had you looked at this area? A. I walked by and looked and was standing there, and everything seemed perfectly safe to me. . . ." Asked about the differentiation of color between blacktop and concrete, Silver acknowledged a distinc-

tion, "but I believe if you go back to where there is a shadow, to me, that night it did not stand out as it does in contrast in this picture. . . . I don't consider when I fell late evening, but I do feel that there was a shadow here which made it look different than it does in this picture."

The only possible reason Silver gave for not being able to see the sloping hole in the catch basin, which was made of concrete lighter than the parking area of black asphalt, was that the sun was setting and her car was parked so that a shadow was cast on that sloping concrete portion.

The photos submitted by Silver of the spot where she fell with her car parked in approximately the same location as the night she fell, clearly indicate, however, that, even when shadowed, the manhole cover on the catch basin is visible, indicating the location of a culvert for draining water.

Silver submitted the affidavit of Liebmann, an engineer, concerning the catch basin, which he contended was defectively designed and constructed because the interface between the parking space and the storm drain was too steep an angle. Nonetheless, Liebmann stated that the danger "would be obvious . . . to any user of the parking lot who could plainly see and become aware of the sharp drop." In his opinion, Silver did not see the danger "because of the shading caused by her car which prevented her from seeing and appreciating the sharp drop off. . . ." The affidavit, however, does not address the significance of the manhole cover in relation to the culvert and drain opening.

"In slip and fall cases, ' "(p)roof of a fall, without more, does not give rise to liability on the part of a proprietor. There must be proof of fault on the part of the owner and ignorance of the danger on the part of the invitee." ' [Cit.]" *Hallberg v. Flat Creek Animal Clinic, P.C.*, 225 Ga. App. 212, 215 (2) (483 SE2d 671) (1997).

Here, there can be no question that the catch basin was an open and obvious static condition and the only possible reason given by Silver as to why she could not see the hole in the catch basin was a shadow created by her car. This case is factually very similar to and controlled by *MARTA v. Fife*, 220 Ga. App. 298 (469 SE2d 420) (1996) (whole court). There, as here, a drainage culvert was involved. Fife stepped off a curb formed by the top of the catch basin and into the culvert which she did not see because she was looking at the door of her sister's car.

Here, as in *Fife*, "[s]ince the drainage depression was open and obvious, [Po Folks, Freyer and Uberto were] under no duty to warn. An owner or occupier of land has a duty of exercising ordinary care to keep the premises and approaches safe for invitees. OCGA § 51-3-1. The basis of the owner's liability is a superior knowledge of the condi-

tion that subjected the invitee to an unreasonable risk of harm. [Cit.] The hazard in this case is a 'static' condition which is not dangerous unless someone fails to observe it and steps into it. [Cit.] In cases involving static conditions, 'if the invitee knows of the condition or hazard there is no duty on the part of the proprietor to warn him and there is no liability for resulting injury because the invitee has as much knowledge as the proprietor does and then by voluntarily acting in view of his knowledge, assumes the risks and dangers incident to the known condition.' (Citation and punctuation omitted.) *Rose v. Kennesaw House*, 203 Ga. App. 648, 649 (417 SE2d 379) (1992). Also, we have held that where there is nothing to obstruct or interfere with the invitee's ability to see the static defect, the owner is justified in assuming that the visitor will see it and realize the risks involved. *Crenshaw v. Hogan*, 203 Ga. App. 104, 105 (416 SE2d 147) (1992)." *Fife*, supra at 300 (2). See also *Tollman v. Zamani*, 224 Ga. App. 518 (481 SE2d 232) (1997) (concrete block, approximately ten inches high and thirty inches wide with four metal bolts protruding from the top approximately six inches, held to be open and obvious static condition in parking lot).

" 'Occupiers of premises whereon the public is invited to come are not required to keep their parking lots and other such areas free from irregularities and trifling defects. One coming upon such premises is not entitled to an absolutely smooth or level way of travel.' . . . [Cit.] 'It is common knowledge that small cracks, holes and uneven spots often develop in pavement; and it has been held that where there is nothing to obstruct or interfere with one's ability to see such a static defect, the owner or occupier of the premises is justified in assuming that a visitor will see it and realize the risk involved.' . . . [Cit.]" *Piggly Wiggly Southern v. Bennett*, 217 Ga. App. 496, 497 (458 SE2d 138) (1995) (involving a concrete lip at the edge of the parking lot where it adjoined a grocery cart ramp); see also *Long John Silver's v. Coleman*, 223 Ga. App. 864 (479 SE2d 141) (1996) (a small hole or crack in a concrete ramp in front of a restaurant).

Certainly as common, if not more so, are catch basins of the type involved here intended to drain water from public ways and parking lots, as acknowledged by Silver. See *Fife*, supra; *Sullenberger v. Grand Union Co.*, 201 Ga. App. 194 (410 SE2d 381) (1991) (use of concrete dividers or bumpers in a parking lot does not constitute negligence).

" 'It is generally incumbent upon one to use his eyesight for the discovering of any obstruction that may have been placed in the way.' (Citations and punctuation omitted.) *McCrary v. Bruno's, Inc.*, 219 Ga. App. 206, 209 (464 SE2d 645) (1995)." *Batten v. J. H. Harvey Co.*, 223 Ga. App. 262, 263 (477 SE2d 400) (1996).

The shadowing of the hole by the sun's setting behind her own

car is the only possible explanation put forward by Silver for why she did not see the hole. Either Silver could see the hole or her inability to be able to do so was caused by her own decision to walk next to a catch basin in a shadowed area because she thought the pavement was level when it was not. "Plaintiff is charged with knowledge of those defects which he had actually observed or *which were so transparently obvious that [her] failure to observe them cannot reasonably be excused.*" (Emphasis supplied.) *Brown v. Carlisle*, 214 Ga. App. 483, 484 (448 SE2d 256) (1994).

Po Folks and the owners of the shopping center were both entitled to summary judgment. See *Anderson v. Turton Dev.*, 225 Ga. App. 270, 273 (2) (483 SE2d 597) (1997) (operator of inn entitled to summary judgment although owner, which designed and constructed allegedly defective handicapped ramp, was not).

*Judgment reversed. Birdsong, P. J., Beasley, Smith and Ruffin, JJ., concur. McMurray, P. J., and Eldridge, J., dissent.*

McMurray, Presiding Judge, dissenting.

For the reasons given in my dissent in *MARTA v. Fife*, 220 Ga. App. 298, 301 (469 SE2d 420), I respectfully dissent from the reversal of the trial court's denial of summary judgment in the case sub judice. In my view, plaintiff's evidence is sufficient to create a genuine issue of material fact whether an optical illusion prevented plaintiff from avoiding the hazard posed by the defectively designed and constructed catch basin. Under *Barentine v. Kroger Co.*, 264 Ga. 224 (443 SE2d 485), such a plausible distraction is sufficient to preclude a ruling that plaintiff failed, as a matter of law, to exercise ordinary care to avoid the danger posed by that dangerously defective catch basin.

I am authorized to state that Judge Eldridge joins in this dissent.

Decided July 11, 1997 — 

*Bach & Hulsey, Robert J. Hulsey, Dermer & Black, Stephen F. Dermer*, for appellants.

*Warshauer & Woodruff, Michael J. Warshauer, Michael R. Goldberg*, for appellee.